**NEC CORPORATION and HNSX
Supercomputers, Inc.,
Plaintiffs,**

v.

**UNITED STATES DEPARTMENT OF
COMMERCE, et al., Defendants,**

**Cray Research, Inc., Defendant–
Intervenor.**

Slip Op. 97–117.
Court No. 96–10–02360.

United States Court of
International Trade.

Aug. 20, 1997.

Paul, Weiss, Rifkind, Wharton & Garrison, Washington, DC (Robert E. Montgomery, Jr., Terence J. Fortune, Robert P. Parker, David J. Weiler, Swati Agrawal), for Plaintiffs.

Frank W. Hunger, Assistant Attorney General; David M. Cohen, Director; Sharon

Y. Eubanks, Deputy Director, A. David Lafer, Attorney, Jeffrey M. Telep, Attorney, U.S. Department of Justice, Civil Division, Commercial Litigation Branch; Patrick V. Gallagher, Attorney–Advisor, Lucius B. Lau, Attorney–Advisor, Office of the Chief Counsel for Import Administration, U.S. Department of Commerce, of counsel, Washington, DC, for Defendant.

Wilmer, Cutler & Pickering, Washington, DC (John D. Greenwald, Michael L. Burack, Charles S. Levy, Brigida Benitez, Stuart M. Weiser ), for Defendant–Intervenor.

## OPINION

POGUE, Judge.

Plaintiffs NEC Corp. and HNSX Supercomputers, Inc. (collectively, "NEC") commenced this action to enjoin the United States Department of Commerce ("Commerce") from conducting an antidumping investigation of *Vector Supercomputers from Japan.* NEC claims that Commerce prejudged the investigation.

Defendant moved to dismiss NEC's complaint for lack of jurisdiction and for failure to state a claim. *See* USCIT Rs. 12(b)(1) and (5). The Court denied Defendant's motion and entered an expedited trial schedule, with the intent to consolidate the preliminary injunction hearing with the trial on the merits. *See NEC Corp. v. United States,* 967 F.Supp. 1305 (CIT 1996).

Subsequently, the Court defined the scope of discovery and scheduled document production and depositions. *See NEC Corp. v. United States,* 21 CIT ——, 958 F.Supp. 624 (1997).[1] On March 4, 1997, the Court issued a protective order for documents produced by Defendant that were covered by certain statutory privileges, the attorney-client privilege, the "state secrets privilege," and the "official information" (or "deliberative process") privilege. *See NEC Corp. v. United States,* Court No. 96–10–02360 (Order, Mar. 4, 1997). The impending issuance of a preliminary determination in the underlying antidumping investigation prevented consolidation of the preliminary injunction hearing with the trial on the merits. The preliminary injunction hearing was held on March 14, 1997. On March 21, 1997, the Court denied NEC's application for a preliminary injunction. *See NEC Corp. v. United States,* Court No. 96–10–02360, (Mem. Op. and Order on Pls.' Mot. for Prelim. Inj., Mar. 21, 1997).

On April 7, 1997, Commerce issued its preliminary determination. *See Vector Supercomputers from Japan,* 62 Fed.Reg. 16,544, 16,547 (Dep't Commerce 1997) (prelim.determ.). NEC did not respond to the investigation questionnaire, citing the instant action as the reason for nonparticipation. *Id.* at 16,545. Without NEC's price information and cost data, Commerce used the "facts otherwise available"[2] to calculate a 454 percent dumping margin for NEC. *Id.*

The Court conducted a three-day trial on April 14, 15, and 21, 1997, to determine whether Commerce had prejudged the supercomputer investigation.[3]

## STRUCTURE AND ADMINISTRATION OF THE ANTIDUMPING STATUTE

The United States antidumping statute bifurcates investigations between two different federal agencies: the Department of Commerce, which makes less than fair value determinations for a class or kind of foreign merchandise; and the International Trade

---

**1.** Prior to issuance of the Court's February 12, 1997, Discovery Order, Defendant petitioned the Court of Appeals for the Federal Circuit for a writ of mandamus to quash the Court's discovery order rendered at the conclusion of several telephone conferences. *See* Tr. of Jan. 8, 1997, Tel. Conf. (# 040); Tr. of Jan. 15, 1997, Tel. Conf. (# 053); Tr. of Jan. 24, 1997, Tel. Conf. (# 062). The Federal Circuit denied the writ application.

**2.** *See* Section 776 of the Tariff Act of 1930, as amended 19 U.S.C. § 1677e(a)(2)(B) ("If an interested party ... fails to proved such informa-

tion by the deadlines for submission of the information ... the administering authority ... shall, ..., use the facts otherwise available in reaching the applicable determination under this subtitle."). All further citations to the antidumping statute are to the section in Title 19 of the U.S.Code.

**3.** The Court wishes to acknowledge the considerable efforts throughout this litigation of counsel for all parties; their cooperation in assembling the record was especially appreciated.

Commission ("ITC"),[4] which makes injury determinations.[5] If Commerce determines that a class or kind of foreign merchandise is being, or is likely to be sold in the United States at less than its fair value ("LTFV," i.e., at a price which is lower than the price at which the merchandise is sold in the country of exportation or to a third country), and the ITC determines that an industry in the United States is materially injured or is threatened with material injury, or the establishment of an industry in the United States is materially retarded, by reason of imports of the subject merchandise, Commerce issues an antidumping order directing the United States Customs Service to collect antidumping duties equal to the amount by which the normal value (i.e., the price in the foreign market) exceeds the export price (i.e., the U.S. price) for the merchandise. 19 U.S.C. § 1673 (1994). That amount is the dumping margin. 19 U.S.C. § 1677(35)(A) (1994).

The antidumping law requires the Secretary of Commerce, or any other officer to whom the responsibility for carrying out the duties of the statute are transferred, to administer antidumping investigations. *See* 19 U.S.C. § 1677(1) (1994). Antidumping investigations may be commenced in two ways. An interested party may file a petition alleging the elements necessary for an antidumping duty, 19 U.S.C. § 1673a(b), or Commerce may self-initiate an investigation. 19 U.S.C. § 1673a(a); 19 C.F.R. § 353.11 (1996). Prior to self-initiation, Commerce prepares a "predecisional" analysis of the imports in question based on information available.[6]

■ Once commenced, the antidumping investigation proceeds through a preliminary and final determination, *see* 19 U.S.C. §§ 1673b(b), 1673d(a) (1994), unless the ITC issues a negative injury determination. *See* 19 U.S.C. § 1673d(c)(2),(3). The purpose of the preliminary determination is to determine whether there is a reasonable basis to believe or suspect that the merchandise which is the subject of the investigation is being sold, or is likely to be sold at LTFV. *See* 19 U.S.C. § 1673b(b) (1994); 19 C.F.R. § 353.15 (1996). The purpose of the final determination is to determine whether the merchandise which is the subject of the investigation is being or is likely to be sold at LTFV. *See* 19 U.S.C. § 1673d(a) (1994); 19 C.F.R. § 353.20. The preliminary and final determinations are based on information presented to or obtained by Commerce during the course of the proceeding. 19 U.S.C. § 1516a(b)(2) (1994) Information not placed on the record may not influence the outcome of the investigation, *see id.,* or be considered for purposes of judicial review. *See Beker Indus. Corp. v. United States,* 7 CIT 313, 315–18, 1984 WL 3727 (1984).

The statute requires Commerce to hold a hearing upon the request of any interested party to the investigation prior to its final determination, *see* 19 U.S.C. § 1677c (1994); 19 C.F.R. § 353.38(b) (1996), and requires Commerce to address, in the final determination, arguments made at the hearing regarding the proper methodology for the dumping calculations at issue. *See* 19 U.S.C. § 1677f(i)(3)(A) (1994).

The statute also requires Commerce to consider information submitted by parties to an investigation, to inform a party if its submission in response to Commerce's request for information is deficient, and to provide the submitting party with an opportunity to remedy or explain its submission. *See* 19 U.S.C. § 1677m(d) (1994).

The statute further requires Commerce to consider information that is submitted by an interested party and is necessary to the preliminary or final determination if (1) the information is submitted within the deadline for its submission, (2) the information can be

**4.** The International Trade Commission is an independent federal agency with investigative powers on trade matters. *See* 19 U.S.C. § 1332 (1994).

**5.** NEC's suit does not encompass the ITC investigation. NEC participated in the ITC's injury investigation. *See Vector Supercomputers from Japan,* 61 Fed.Reg. 50,331 (ITC 1996) (prelim.

injury determ.). What NEC challenges here is Commerce's ability to make the less than fair value determination.

**6.** *See* Tr. Powell Trial Test. at 188, Ct. Doc. # 177 (Ct. Doc. refers to the document number recorded on the official docket sheet, which is maintained by the Court's Clerk).

verified, (3) the information is not so incomplete that it cannot serve as a reliable basis for reaching the applicable determination, (4) the interested party has demonstrated that it acted to the best of its ability in providing the information and meeting Commerce's requirements, and (5) the information can be used without undue difficulties. *See* 19 U.S.C. § 1677m(e) (1994).

Additionally, the statute requires Commerce to "verify all information relied upon in making a final determination of an investigation." 19 U.S.C § 1677m(i)(1) (1994); 19 C.F.R. § 353.36(a)(1)(i) (1996).

Congress intended antidumping investigations to be "transparent." *See* S. Rep. No 96–249, at 38, 41 (1979), *reprinted in* 1979 U.S.C.C.A.N. 424, 427.[7] Included in the record of the proceedings is a record of any ex parte meeting between interested parties, (or other persons providing factual information in connection with a proceeding), and the person charged with making the determination, (or any person charged with making a final recommendation to that person), in connection with that proceeding. *See* 19 U.S.C. § 1677f(3) (1994); 19 C.F.R. § 353.35 (1996).

Interested parties have the opportunity to submit factual information to rebut, clarify, or correct the factual submissions of another interested party. *See* 19 C.F.R. § 353.31(a)(2) (1996). Interested parties also may submit case briefs that present their arguments on issues relevant to the final determination. *See* 19 C.F.R. § 353.38(c)(2) (1996).

Commerce addresses issues prior to and again following the preliminary determination.[8] Commerce re-examines its analysis between the preliminary and the final determination.[9] The investigation may produce a dumping margin in a preliminary determination that is different from the margin forecast in a self-initiated predecisional analysis (or alleged in a petition pursuant to which an investigation was initiated), and the dumping margin in the final determination may differ significantly from the dumping margin in the preliminary determination.[10]

■ Judicial review of Commerce's final determination is available in the U.S. Court of International Trade. *See* 28 U.S.C. § 1581(c);[11] 19 U.S.C. § 1516a(a)(2)(B)(i).

---

7. "Other significant changes in existing law adopted in this title included ... greater transparency of investigations," S. Rep. No 96–246, at 38 (1979), *reprinted in* 1979 U.S.C.C.A.N. 424; "The major common elements of the [Subsidies Agreement and the Antidumping Code] are: ... 3. Provisions for 'transparency' in all phases of a ... dumping case,...." *Id.* at 41, *reprinted in* 1979 U.S.C.C.A.N. 427. *See also* H. Rep. No. 96–317, at 45 (1979) ("With the rise in the number of foreign antidumping proceedings by Code parties, ..., the United States has become increasingly concerned that other countries utilize open public proceedings, similar to those in the United States, to ensure importers and exporters are treated fairly.").

8. *See* Esserman Prelim. Inj. Test., Hr'g Exs. and Docs., Vol. 2, Tab 38 at 222–23.

9. *Id.* at 223, 236.

10. *Id.; Compare Certain Pasta From Italy,* 61 Fed.Reg. 1,344, 1,351 (Dep't Commerce 1996) (prelim.determ.)(22.15%), *with* 61 Fed.Reg. 42,-231, 42,232 (final determ.) (0.00%); *compare Polyvinyl Alcohol From the People's Republic of China,* 60 Fed.Reg. 52,547, 52,649 (Dep't Commerce 1995) (prelim.determ.) (187.56%), *with* 61 Fed.Reg. 14,057, 14063 (final determ.) (0.00%); *compare Manganese Metal From the People's Republic of China,* 60 Fed.Reg. 37,875 (Dep't Commerce 1995) (amend.prelim.determ.) (82.44%), *with* 61 Fed.Reg. 4,415, 4,418 (amend. final determ.) (0.97%).

11. The Court exercised jurisdiction over this action pursuant to 28 U.S.C. § 1581(i), the Court's residual jurisdiction provision. *See Asociacion Colombiana de Exportadores de Flores (Asocoflores) v. United States,* 13 CIT 584, 585, 717 F.Supp. 847, 849 (1989). For § 1581(i) jurisdiction to attach, relief under another section (in this case § 1581(c)) must be "manifestly inadequate." *Miller & Co. v. United States,* 5 Fed. Cir. (T) 122, 124, 824 F.2d 961, 963 (1987). In an earlier order, the Court held that requiring exhaustion of administrative remedies, *see* 28 U.S.C. § 2637(d); *B–West Imports, Inc. v. United States,* 880 F.Supp. 853, 858–59 (CIT 1995), would be inappropriate for NEC's claim of prejudgment given that the remedy of disqualification of a biased decisionmaker could be granted at the outset of the investigation, avoiding the need to undo a complicated administrative proceeding if the actionable allegations in NEC's complaint proved to be true. *See NEC Corp. v. United States,* 967 F.Supp. 1305, 1306 (CIT 1996) If the matter was in fact prejudged, requiring NEC to submit to an administrative process rendered a hollow formality by the prejudgment, *see infra* p. 326, would not provide an adequate remedy. *See Barry v. Barchi,* 443 U.S. 55, 63 n.

The court reviews the determination to insure Commerce's action is in accordance with law and supported by substantial evidence. *See* 19 U.S.C. § 1516a(b)(1)(B)(i).

Subject to any policies and directives the Secretary may prescribe, the authority to conduct investigations and make all determinations in antidumping proceedings has been delegated to the Under Secretary for International Trade, the head of the International Trade Administration, pursuant to Department of Commerce Organization Order 10–3 at § 4.01b.[12] Subject to any policies and directives the Under Secretary may prescribe, the Under Secretary, in turn, has delegated the authority to conduct investigations and make all determinations in antidumping proceedings to the Assistant Secretary for Import Administration. *See* Department of Commerce Organization and Function Order 41–1 Amendment 3 at § 1.01d.[13]

The Assistant Secretary for Import Administration is the head of Import Administration. The Assistant Secretary exercises the functions of the Under Secretary and the administering authority under the U.S. antidumping law, including responsibility for the initiation of investigations, and for ensuring the proper administration of the antidumping laws. *See* Department of Commerce Organization and Function Order 41–1 at § 2. By virtue of this delegation, the Assistant Secretary for Import Administration is the decisionmaker in antidumping investigations. The Assistant Secretary for Import Administration reports to the Under Secretary of Commerce for International Trade. The Under Secretary may give general policy guidance to the Assistant Secretary regarding administration of the antidumping statute, but is not involved in the conduct of, or the determinations issued in connection with, specific investigations. *See* Department of Commerce Organization and Function Order 41–1, Amendment 3 at § 1.01d.

As head of Import Administration, the Assistant Secretary for Import Administration supervises Import Administration staff. Since June 4, 1996, Import Administration staff have been organized into three Antidumping and Countervailing Duty Groups, each of which is headed by a Deputy Assistant Secretary. *See* Department Organization and Function Order 41–1 at § 2.04b. Antidumping investigations are managed on a day-to-day basis by an Import Administration investigation team that works under a Deputy Assistant Secretary.[14] Each investi-

10, 99 S.Ct. 2642, 2648 n. 10, 61 L.Ed.2d 365 (1979) ("Under existing authority, exhaustion of administrative remedies is not required when 'the question of the adequacy of the administrative remedy ... [is] for all practical purposes identical with the merits of [the plaintiff's] lawsuit.'") (quoting *Gibson v. Berryhill*, 411 U.S. 564, 575, 93 S.Ct. 1689, 1696, 36 L.Ed.2d 488 (1973)); *McCarthy v. Madigan*, 503 U.S. 140, 148, 112 S.Ct. 1081, 1088, 117 L.Ed.2d 291 (1992) (stating that exhaustion of administrative remedies may not be required "where the administrative body is shown to be biased or has otherwise predetermined the issue before it.").

**12.** The Department of Commerce Organization Order is publicly available through the Commerce Department, but not separately published in any secondary source.

**13.** The Department of Commerce Organization and Function Order is publicly available through the Commerce Department, but not separately published in any secondary source.

**14.** Each Deputy Assistant Secretary is responsible for managing the antidumping proceedings assigned to their respective groups and each reports directly to the Assistant Secretary for Import Administration. *See* Department of Commerce Organization and Function Order 41–1 at § 2.04. The antidumping investigation of Vector Supercomputers from Japan is being conducted by members of Antidumping and Countervailing Duty Enforcement Group I. Uncontested Fact ¶ 61, *NEC Corp. v. United States*, Court No. 96–10–02360 (Pretrial Order at 22, Apr. 11, 1997) (hereinafter UF ¶ ——, Pretrial Order at ——). To begin an antidumping investigation, the Deputy Assistant Secretary assigns the petition (or the task of doing a self-initiation predecisional analysis) to an Office Director who, in turn, selects Import Compliance Specialists to work on the investigation. UF ¶ 68, Pretrial Order at 26. Within each Antidumping and Countervailing Duty Enforcement Group are three AD/CVD Enforcement Offices. Mr. Gary Taverman is the Office Director responsible for the investigation team assigned the antidumping investigation of Vector Supercomputers from Japan. This team includes Mr. Edward Easton, Ms. Sunkyu Kim, and other Import Compliance Specialists, as necessary, in Mr. Taverman's Office of Antidumping and Countervailing Duty Enforcement II. UF ¶ 62, Pretrial Order at 22–23.

gation team normally is comprised of one or more import compliance specialists, one or more accountants, an attorney, and a policy analyst.[15] The team is supervised by the Office Director and may have a team leader.[16] The accountant, attorney and policy analyst are assigned by their respective offices.[17] For accounting, legal, and policy issues, the attorney, the accountant, and the policy analyst report directly to their respective supervisors.[18] The team solicits, collects and analyzes information submitted for the record of the investigation and presents issues to the Assistant Secretary for decision, along with the team's recommendations on those issues.[19]

## FACTUAL BACKGROUND

The University Corporation for Atmospheric Research ("UCAR") is a research consortium funded in part by the National Science Foundation ("NSF"), an independent Executive Branch agency of the U.S. Government. In March 1995, UCAR initiated a bidding process to procure advanced supercomputers.[20] As a result of this process, three companies—Federal Computing Corporation ("FCC"), supplying vector supercomputers produced by NEC Corporation ("NEC"), Cray Research, Inc. ("Cray") and Fujitsu Limited ("Fujitsu")—were invited to submit a "best and final offer." [21]

Guided by its obligation to assure that the procurement process was free of "noncompetitive practices," [22] on or about March 3, 1996, NSF instructed UCAR to obtain evidence that no dumping was involved in NEC's offer to supply UCAR.[23] In response to NSF's directive, UCAR commissioned Dr. Lloyd Thorndyke to prepare an analysis of NEC's offer.[24] Dr. Thorndyke's analysis concluded that NEC's offer did not involve dumping.[25]

NSF did not request Commerce to undertake a dumping analysis of the UCAR procurement.[26] Nevertheless, in contemplating a self-initiated dumping investigation, *see* 19 U.S.C. § 1673a(a)(1) (1994), Commerce undertook a preliminary analysis of NEC's bid.[27]

Specifically, on April 3, 1996, Ms. Susan Esserman, Assistant Secretary of Commerce for Import Administration, assembled a team of Import Administration officials to collect information and analyze the possibility that NEC's offer of supercomputers to UCAR might involve dumping.[28]

On April 24, 1996, Ms. Esserman convened an interagency meeting to obtain technical information on supercomputers and hear a presentation by NSF on the UCAR procurement.[29]

**15.** UF ¶ 68, Pretrial Order at 26.

**16.** *Id.*

**17.** *Id.*

**18.** *Id.*

**19.** Investigation teams "analyze petitions submitted by manufacturers, producers, trade associations, and unions under the AD/CVD laws; conduct investigations and, for the findings, orders, or agreements under their jurisdiction, the administrative reviews required under the AD/CVD laws, including the determination of product definitions and the drafting and presentation of questionnaires, analysis of responses to questionnaires and the conduct of on site verification of the accuracy and completeness of responses; . . . [and] prepare recommendations regarding the disposition of individual AD/CVD investigations and reviews." Department of Commerce Organization and Function Order 41–1 at § 2.04b.

**20.** UF ¶ 1, Pretrial Order at 7.

**21.** UF ¶ 2, Pretrial Order at 7.

**22.** UF ¶ 19, *Id.* at 12.

**23.** Tr. Rudolph Trial Test. at 380, Ct. Doc. # 179; *see also* UF ¶ 6, Pretrial Order at 8.

**24.** UF ¶ 7, Pretrial Order at 8.

**25.** UF ¶ 8, *Id.*

**26.** Am. Answer ¶ 28, Hr'g Exs. and Docs., Vol. 2, Tab 33 at 8; Tr. Powell Trial Test. at 168, Ct. Doc. # 177.

**27.** Esserman Prelim. Inj. Test., Hr'g Exs. and Docs., Vol. 2, Tab 38 at 135, 162, 179, 185; Powell Dep., Hr'g Exs. and Docs., Vol. 4, Tab 72 at 45; *see also* Tr. Powell Trial Test. at 168, 188–192, Ct. Doc. # 177.

**28.** UF ¶ 13, Pretrial Order at 13; *see also* Esserman Prelim. Inj. Test., Hr'g Exs. and Docs., Vol. 2, Tab 38 at 177.

On May 2, 1996, Ms. Esserman became Commerce's Acting General Counsel.[30] In early May, Mr. Paul Joffe became the Acting Assistant Secretary for Import Administration.[31] On May 13, 1996, Ms. Esserman convened an interagency meeting with senior officials of NSF and other agencies to discuss the results of Commerce's preliminary analysis of NEC's UCAR bid. Attendees at the meeting included, *inter alia:* Ms. Esserman, Paul L. Joffe, Eleanor R. Lewis,[32] Gary Taverman,[33] John N. McPhee,[34] Mary Good,[35] Stephen J. Powell, Jr.,[36] Dr. George Cotter,[37] Dr. Neal Lane, the director of NSF, and Lawrence Rudolph, NSF's General Counsel.[38] The specifics of the May 13th meeting are discussed *infra* pp. 332–33.

On May 17, 1996, Ambassador Stuart Eizenstat, Under Secretary for International Trade, and Ms. Esserman met with Daniel K. Tarullo of the National Economic Council to discuss the UCAR procurement.[39] The meeting was limited to a short factual briefing of the UCAR procurement and Import Administration's inquiry into the matter.[40]

Also on May 17, 1996, Mr. Brian Mannion, Grants and Agreements Officer of NSF, wrote to Mr. William Rawson, Vice President of UCAR,[41] and stated, *inter alia:*

> Under the Cooperative Agreement between UCAR and NSF, UCAR is required to obtain NSF's approval before UCAR enters into the agreement to acquire the supercomputing capacity that is the subject of this procurement. In purchasing this supercomputer capacity, UCAR must observe the procurement standards set forth in Office of Management and Budget Circular A–110, *Uniform Administrative Requirements for Grants and Agreements with Institutions of Higher Education, Hospitals, and Other Non–Profit Organizations*, which was incorporated by reference in section 2b of clause I of the general provisions of the Cooperative Agreement. Among other things, those standards require that:
>
>> All procurement transactions shall be conducted in a manner to provide, to the maximum extent practical, open and free competition. The recipient shall be alert to organizational conflicts of interest as well as noncompetitive practices among

**29.** First Esserman Decl. ¶ 9, Hr'g Exs. and Docs., Vol. 1, Tab 16 at 2–3; Commerce Admissions ¶ 16, Hr'g Exs. and Docs., Vol. 2, Tab 34 at 6–7; McPhee Prelim. Inj. Test., Hr'g Exs. and Docs., Vol. 2, Tab 38 at 65; Tr. Eleanor Lewis Trial Test. at 72–77, Ct. Doc. # 177.

**30.** UF ¶ 16, Pretrial Order at 10.

**31.** UF ¶ 17, *Id.*

**32.** Chief Counsel for International Commerce, Office of the General Counsel ("OGC")/DOC. *Id.*

**33.** Office Director, Enforcement Group I, IA/ITA/DOC. *Id.* at 3.

**34.** Director of Department's Office of Computers and Business Equipment, Trade Development ("TD")/ITA/DOC. The office is responsible for monitoring developments in the computer industry, including software and software aspects, and working with the industry and trade associations and other parts of the government to stimulate export sales. UF ¶ 12, Pretrial Order at 9. Mr. McPhee has been employed at the Commerce Department for over twenty years, and is in frequent contact with Cray on a variety of matters as part of his official duties. *Id.*

**35.** Under Secretary for Technology, DOC. Def.'s Resp. to Ct. Ordered Disc., Hr'g Exs. and Docs., Vol. 2, Tab 32 at 4.

**36.** Chief Counsel, IA/ITA/DOC. *Id.*

**37.** Chief Scientist, National Security Agency. *Id.*

**38.** UF ¶ 18, *Id.* at 11.

**39.** Esserman Prelim. Inj. Test., Hr'g Exs. And Docs., Vol. 2, Tab 38 at 160; Decl. of Mary Good at 2, Under Secretary of Technology, DOC, Ct. Doc. ¶ 164.

**40.** *Id.* at 161–163; *id.* at 2–3. Having received the testimony of Ms. Esserman, as well as the Declaration of Mary Good, two attendees of the May 17, 1996, meeting, the Court did not require testimony at trial by Mr. Eizenstat to establish the substance of the meeting. *See Warzon v. Drew*, 155 F.R.D. 183, 185 (E.D.Wis.1994) (obtaining involuntary testimony of high ranking government officials requires that the "evidence must not be available through an alternative source or via less burdensome means.") The Esserman testimony and the Good declaration were sufficient alternative sources of the evidence.

**41.** UF ¶ 19, Pretrial Order at 12.

contractors that may restrict or eliminate competition or otherwise restrain trade.

As you know, NSF has been concerned about the possibility that one or more of the proposals could give rise to the imposition of an "antidumping duty" . . .

UCAR has provided NSF with several documents that addressed the "antidumping" issue. Subsequently, officials at the Department of Commerce, which has statutory responsibility for administering relevant provisions of the antidumping laws, have advised NSF that they have performed a "constructive analysis" of the proposal with the best performance characteristics. They have reached the preliminary conclusion that the proposal does not constitute an offer at "fair value."

As you enter into final negotiations with the firm that in UCAR's judgment has submitted the best proposal, we remain concerned about the dumping issue. Prior to approving this award, therefore, NSF will require that UCAR has given this issue due consideration and that UCAR has obtained sufficient documentation to demonstrate that the proposal does not reflect any "noncompetitive practices among contractors that may restrict or eliminate competition or otherwise restrain trade" in violation of the antidumping laws.[42]

On May 20, 1996, UCAR announced that it had selected for final contract negotiations FCC's bid to supply a system of four NEC 32 processor SX–4 vector supercomputers for $35.25 million. UCAR found that the NEC systems offered by FCC "provide a distinct technical advantage compared to the systems offered by the other vendors." [43]

On May 20, 1996, Commerce transmitted to NSF a letter from Acting Assistant Secretary Joffe to Dr. Lane, Director of NSF, (the "Joffe Letter") stating that "using standard methodology prescribed by the dumping law" Commerce had "estimated" that NEC's bid to supply UCAR was below cost, and that the dumping margin on NEC's UCAR bid "is likely to be very high," and further, that UCAR's acquisition of NEC supercomputers "could have a serious adverse impact on the domestic industry's efforts to develop a more advanced version of the supercomputer system to be supplied." [44] The Joffe Letter also stated that a formal antidumping investigation could be self-initiated by Commerce or initiated pursuant to an antidumping petition.[45] The Secretary of Commerce approved the delivery of the "Joffe Letter" to NSF.[46]

On the same date, Mr. Joffe sent a second letter to Dr. Lane transmitting a document entitled "Predecisional Memorandum." [47] The Predecisional Memorandum contained a "Dumping Analysis" that included a specific, estimated "Margin Calculation" ranging from 163.38 to 280 percent.[48] The Predecisional Memorandum was not based on NEC's actual cost and pricing data that would be used to make a formal dumping finding under the statute.[49] Instead, Import Administration staff reviewed various sources of information, including estimates of NEC's costs available to the U.S. Government, the Thorndyke Study, and information from NEC financial statements.[50]

**42.** Hr'g Exs. and Docs., Vol. 1, Tab 23.

**43.** UF ¶ 10, Pretrial Order at 8 (quoting UCAR May 20, 1996, Press Release).

**44.** Hr'g Exs. and Docs., Vol. 1, Tab 14.

**45.** UF ¶ 23, Pretrial Order at 12–13; *see also* Hr'g Exs. and Docs., Vol. 1, Tab 14.

**46.** Esserman Prelim. Inj. Test., Hr'g Exs. and Docs., Vol. 2, Tab 38 at 175–76.

**47.** UF ¶ 24, Pretrial Order at 13; *see also* Hr'g Exs. And Docs., Vol. 1, Tab 15.

**48.** Hr'g Exs. and Docs., Vol. 1, Tab 15 at 3.

**49.** Esserman Prelim. Inj. Test., Hr'g Exs. and Docs., Vol. 2, Tab 38 at 150–51. ("we were involved with a preliminary analysis ... when *you make a preliminary,* [19 U.S.C. § 1673b(b) ], or a final determination, [19 U.S.C. § 1673d(a) ], [there is] a full review of a foreign producer's data, ...."). Among other things, that review includes verification of the foreign producers' data. *See* 19 U.S.C. § 1677m(i)(1) (1994); 19 C.F.R. § 353.36(a)(1)(i) (1996).

**50.** UF ¶ 26, Pretrial Order at 14.

For reasons relating to NSF's procurement procedures, NSF requested authorization from Commerce to release the analysis to NEC, UCAR and NCAR.[51] Commerce transmitted the May 20 Predecisional Memorandum to NSF with authorization for NSF to distribute the Memorandum to NEC, UCAR and NCAR as within Commerce's "intended official use."[52] Commerce and NSF agreed that the disclosure of the Predecisional Memorandum to NSF, NEC, UCAR and NCAR was for purposes of the procurement.[53]

Commerce made the Joffe Letter available to the press and public and faxed it directly to Cray on May 20, 1996.[54] It was published in *Inside U.S. Trade* on May 24, 1996.[55] The Predecisional Memorandum was published in *Inside U.S. Trade* on September 13, 1996.[56] There is no evidence of *Inside U.S. Trade*'s source for publication.

On June 4, 1996, Cray executives, accompanied by outside counsel, met with Import Administration staff for pre-petition counseling.[57]

On June 5, 1996, Robert LaRussa, who had no prior involvement in the issues relating to the UCAR procurement, succeeded Mr. Joffe as Acting Assistant Secretary of Commerce for Import Administration.[58] On June 7, 1996, Mr. LaRussa was briefed by Mr. Taverman on the predecisional analysis and the dissemination and general content of the Predecisional Memorandum.[59] He also read the Joffe Letter at that time.[60] Mr. LaRussa did not read the predecisional dumping analysis.[61]

Mr. LaRussa has had no communication with Mr. Eizenstat or Ms. Esserman relating to the preparation, dissemination, purpose, or content of the Predecisional Memorandum; neither Ms. Esserman nor Mr. Eizenstat had communicated to Mr. LaRussa their views on Cray's antidumping petition; and Mr. Eizenstat gave Mr. LaRussa only general guidance to observe all standard applicable procedures in the pending investigation of vector supercomputers from Japan.[62]

On June 6, 1996, Mr. Joffe, then a Senior Advisor to the Assistant Secretary for Import Administration, Mr. Powell, and Mr. Taverman, met with Democratic staff members from the House of Representatives Science Committee to discuss the UCAR procurement. Mr. Taverman explained the predecisional analysis and the resulting estimated dumping margins.[63]

On June 10, 1996, Ms. Esserman, Mr. Joffe, Mr. LaRussa, Mr. Powell, and Mr. Taverman met with staff members of the House Ways and Means Committee and Senate Finance Committee, at the request of one of the staff members, to discuss the UCAR procurement. Mr. Taverman again explained the predecisional analysis and the estimated dumping margins.[64] Acting Assistant Secretary LaRussa did not make any

---

51. Tr. Powell Trial Test. at 178–82, Ct. Doc. # 177; Tr. Rudolph Trial Test. at 384, 417–18, Ct. Doc. # 179.

52. Joffe Transmittal Letter, Hr'g Exs. and Docs., Vol. 1, Tab 15; *see also* Tr. Powell Trial Test. at 185, Ct. Doc. # 177; Tr. Rudolph Trial Test. at 400, Ct. Doc. # 179.

53. *Id.*

54. UF ¶ 29, Pretrial Order at 14.

55. UF ¶ 30, *Id.; see also* Hr'g Exs. and Docs., Vol. 2, Tab 55.

56. Hr'g Exs. and Docs., Vol. 2, Tab 55.

57. UF ¶ 41, Pretrial Order at 17.

58. UF ¶ 32, Pretrial Order at 15.

59. Suppl. LaRussa Interrog. Resp. 2, Hr'g Exs. and Docs., Vol. 2, Tab 37 at 3–4; Taverman Dep., Hr'g Exs. and Docs., Vol. 4, Tab 73 at 42–47.

60. Suppl. LaRussa Interrog. Resp. 2, Hr'g Exs. and Docs., Vol. 2, Tab 37 at 3.

61. *Id.*

62. Suppl. LaRussa Interrog. Resp. 2, 3, 6, Hr'g Exs. and Docs., Vol. 2, Tab 37 at 3, 6, 11–12.

63. UF ¶ 33, Pretrial Order at 15. The Predecisional Memorandum was not given to the Congressional staff members.

64. UF ¶ 34, *Id.* The Predecisional Memorandum was not given to the Congressional staff members.

presentation or ask or answer any questions at the June 10 meeting.[65]

On June 11, 1996, Ms. Esserman, Mr. Powell, Mr. Joffe, Mr. Taverman, and Mr. La-Russa met with Representative David E. Skaggs,[66] at his request, to discuss the UCAR procurement. They explained the antidumping process to Congressman Skaggs, and Mr. Taverman explained in general terms the predecisional dumping analysis.[67]

On June 20, 1996, Mr. Rawson of UCAR wrote to Mr. Mannion at the NSF to state that, in response to NSF's May 17 letter, UCAR had asked FCC/HNSX/NEC to comment upon Commerce's May 20, 1996, Predecisional Memorandum and also had retained its own legal and economic experts to evaluate the FCC/HNSX/NEC response as well as Commerce's Predecisional Memorandum.[68]

UCAR concluded, based on its information, that the FCC/HNSX/NEC offer to supply four of NEC's SX–4 32 processor supercomputers was not at less than fair value.[69]

On June 24, 1996, NSF Director Lane forwarded to the Secretary of Commerce, Michael Kantor, Mr. Rawson's letter of June 20, 1996, together with the enclosed cost analyses, asking Secretary Kantor to inform him "in the near future" about Commerce's intentions regarding the self-initiation of an antidumping investigation of supercomputers from Japan.[70] Also on June 24, 1996, NSF General Counsel Rudolph wrote to Ms. Esserman conveying the same cost analyses.[71]

On July 29, 1996, Cray filed an antidumping petition with Commerce and the U.S. International Trade Commission ("ITC") against vector supercomputers from Japan.[72]

On August 2, 1996, NEC wrote to Under Secretary Eizenstat advising him of a request to Commerce's Inspector General for an investigation of the circumstances surrounding the issuance of Commerce's Predecisional Memorandum as well as NEC's claim that Commerce had improperly released NEC's business confidential information to Cray. NEC sought suspension of the antidumping investigation initiated pursuant to Cray's petition, pending the conclusion of the Inspector General's investigation.[73]

On August 14, 1996, Mr. LaRussa received a note from Under Secretary Eizenstat transmitting a letter from NEC's counsel dated August 2, 1996, and instructing Mr. LaRussa to draft a response to a letter from NEC's counsel containing allegations that Commerce Department actions related to its antidumping investigation "may include violations of a Federal criminal statute, applicable Department regulations, and the Due Process Clause of the Constitution."[74]

On August 19, 1996, Commerce initiated the supercomputer investigation.[75] The investigation was assigned to Import Administration's Office of Antidumping and Countervailing Duty Enforcement II.[76]

On August 20, 1996, NSF issued a press release in which Dr. Neal Lane, NSF's Director, stated, *inter alia:*

> In my view, it would be inappropriate for NSF to approve this procurement until the dumping issue has been resolved.

---

**65.** UF ¶ 35, *Id.* at 16.

**66.** Representative David E. Skaggs represents the 2nd Congressional District of Colorado which includes Boulder Colorado, where UCAR and NCAR are located. UF ¶ 36, *Id.*

**67.** UF ¶ 37, *Id.* Subsequently, the UCAR procurement and Commerce's preliminary analysis were the subject of Congressional debate on an amendment to a House Appropriations Bill. *See* H.R. Rep. 104–628 at 124–129; 142 Cong. Rec. H6905–02 (1996).

**68.** UF ¶ 38, Pretrial Order at 16.

**69.** UF ¶ 39, *Id.* at 17.

**70.** UF ¶ 40, *Id.*

**71.** UF ¶ 42, *Id.*

**72.** UF ¶ 43, *Id.; see also Vector Supercomputers from Japan,* 61 Fed.Reg. 43,527 (Dep't Commerce 1996) (init. antidumping invest.).

**73.** UF ¶ 44, Pretrial Order at 17–18.

**74.** *Id.*

**75.** *Vector Supercomputers from Japan,* 61 Fed. Reg. 43,527 (Dep't Commerce 1996) (init. antidumping invest.)

**76.** UF ¶ 46, Pretrial Order at 18.

In light of the numerous questions raised about and interest expressed in this procurement, I am pleased that the issue of dumping is being properly addressed by the appropriate federal agencies. The Department of Commerce and the International Trade Commission have the statutory authority, the expertise, and the established procedures to determine whether this offer is being made at less than fair value, and whether it would be injurious to American industry.

I am acutely aware that the National Center for Atmospheric Research (NCAR), which is operated by UCAR, needs state-of-the-art computational equipment to maintain U.S. world leadership in climate modeling research. I feel, however, that acting now on this procurement would be inconsistent with the responsible stewardship of taxpayer monies.[77]

On September 12, 1996, the Chairman of the ITC notified the Secretary of Commerce that the Commission had made an affirmative determination in the preliminary injury phase of the antidumping investigation regarding vector supercomputers from Japan,[78] which was published on September 25, 1996, in the Federal Register.[79]

On September 30, 1996, Commerce sent Section A of its antidumping questionnaire to counsel for NEC.[80] The same questionnaire was sent to Fujitsu Limited ("Fujitsu").[81]

On October 15, 1996, NEC sent a letter to Secretary Kantor stating "we have today asked the Court of International Trade to enjoin the Department's continued prosecution of its antidumping investigation of super-computers from Japan."[82] NEC explained that the reason for this action was that Commerce publicly endorsed "the merits of our competitor's dumping claim before the antidumping investigation was even initiated" and therefore "Commerce has deprived NEC and HNSX of the right to a fair and impartial decision-maker to which they are entitled under the Fifth Amendment of the United States Constitution. Accordingly, [NEC] will respectfully withhold their response to the Department questionnaire until such time as a qualified independent party, who is impartial and has not already prejudged the matter, is appointed as a 'special master' to conduct the investigation."[83]

As noted above, NEC filed this lawsuit on October 15, 1996 seeking to enjoin Commerce's investigation of vector supercomputers from Japan.

## DISCUSSION

NEC's constitutionally based prejudgment claim (seeking disqualification of an administrative decisionmaker) invokes the protections of the Due Process Clause of the Fifth Amendment.[84] *See, e.g., Withrow v. Larkin*, 421 U.S. 35, 46, 95 S.Ct. 1456, 1464, 43 L.Ed.2d 712 (1975)(reviewing whether combination of investigative and adjudicative functions creates an unconstitutional risk of bias in administrative adjudication). Before an administrative action implicates constitutional due process concerns, however, that action must deprive a party of "life, liberty, or property."[85] Therefore, a prejudgment claim based on the Due Process Clause requires that the court "first determine wheth-

---

**77.** UF ¶ 48, *Id.; see also* Ex. Q attached to Pls.' Mem. of P. & A. in Supp. of Mot. for Prelim. Inj., Court Doc. # 004.

**78.** UF ¶ 49, Pretrial Order at 19.

**79.** UF ¶ 51, *Id.; see also Vector Supercomputers from Japan*, 61 Fed.Reg. 50,331 (ITC 1996) (prelim. injury determ.).

**80.** UF ¶ 52, Pretrial Order at 19.

**81.** *Id.*

**82.** UF ¶ 53, *Id.* at 19–20.

**83.** *Id.*

**84.** U.S. Const. Amend. V.

**85.** The Due Process Clause provides, "No person shall ... be deprived of life, liberty, or property, without due process of law." U.S. Const. Amend. V. "The [Supreme] Court analyzes each of these three concepts separately; unless an agency action threatens to deprive an individual of something that fits within one of these three categories, the procedures used by the agency are not subject to review under the Due Process Clause." Kenneth Culp Davis & Richard J. Pierce, *Administrative Law Treatise* § 9.4 at 21 (3d ed.1994).

er a protected property or liberty interest exists," before determining "what procedures are necessary to protect that interest." *Techsnabexport, Ltd. v. United States*, 16 CIT 420, 426, 795 F.Supp. 428, 435 (1992) (citing *American Ass'n of Exporters & Importers–Textile v. United States*, 751 F.2d 1239, 1250 (1985)).

■ The Supreme Court has interpreted Congress' power "to regulate Commerce with foreign nations"[86] to be "so complete ... that no one can be said to have a vested right to carry on foreign commerce with the United States." *The Abby Dodge v. United States*, 223 U.S. 166, 176–77, 32 S.Ct. 310, 313, 55 L.Ed. 390 (1912); *see also* authorities cited in *Arjay Assocs., Inc. v. United States*, 8 Fed. Cir (T) 16, 18–20, 891 F.2d 894, 896–98 (1989);[87] and *B–West Imports, Inc. v.*

*United States*, 880 F.Supp. 853, 863–64 (CIT 1995). NEC did not identify a specific constitutionally protected interest at stake in the pending antidumping investigation. Indeed, the authorities set forth in *Arjay* demonstrate judicial caution toward recognition of constitutionally protected interests for matters involving foreign trade or commerce. These cases from the Supreme Court and the Federal Circuit seem to preclude recognition of a constitutionally based prejudgment claim.

■ The absence of a constitutional claim, however, does not foreclose a statutory claim. A statute defining procedures for submission of information, 19 U.S.C. § 1677m(d) & (e), and for a hearing, 19 U.S.C. § 1677c, "command[s] by implica-

---

86. U.S. Const. Art. I, § 8, cl. 3.

87. *Arjay* cites the following authorities:

*Buttfield v. Stranahan*, 192 U.S. 470, 493, 24 S.Ct. 349, 354, 48 L.Ed. 525 (1904) ("As a result of the complete power of Congress over foreign commerce, it necessarily follows that no individual has a vested right to trade with foreign nations, which is so broad in character as to limit and restrict the power of Congress to determine what articles of merchandise may be imported into this country and the terms upon which a right to import may be exercised. This being true, it results that a statute which restrains the introduction of particular goods into the United States from considerations of public policy does not violate the due process clause of the Constitution."); ... *American Assoc. of Exporters and Importers–Textile v. United States*, 751 F.2d 1239, 1250 (Fed.Cir.1985) ("No one has a protectable interest to engage in international trade."); *Ganadera Indus., S.A. v. Block*, 727 F.2d 1156, 1160 (D.C.Cir.1984) ("[Ganadera's] due process argument must fail because [Ganadera] has no constitutionally-protected right to import into the United States."); ....

The absence of a constitutional right has been recognized in relation to aspects of international trade other than exclusion from importation. *See Japan Line, Ltd. v. County of Los Angeles*, 441 U.S. 434, 448–49, 99 S.Ct. 1813, 1821–22, 60 L.Ed.2d 336 (1979); *Board of Trustees of Univ. of Ill. v. United States*, 289 U.S. 48, 57, 53 S.Ct. 509, 509–10, 77 L.Ed. 1025 (1933) (no violation of federalism in imposition of duty on state importation) ("The Congress may determine what articles may be imported into this country and the terms upon which importation is permitted. No one can be said to have a vested right to carry on

foreign commerce with the United States."); *Norwegian Nitrogen Prods. Co. v. United States*, 288 U.S. 294, 318, 53 S.Ct. 350, 359, 77 L.Ed. 796 (1933) ("No one has a legal right to the maintenance of an existing rate or duty."); *North Am. Foreign Trading Corp. v. United States*, 783 F.2d 1031, 1032 (Fed.Cir.1986) ("No vested right to a particular classification or rate of duty or preference is acquired at the time of importation."); *United States v. Yoshida Int'l, Inc.*, 526 F.2d 560, 580, 63 C.C.P.A. 15 (1975); *United States v. Zenith Radio Corp.*, 562 F.2d 1209, 1217, 64 C.C.P.A. 130 (1977), *aff'd*, 437 U.S. 443, 98 S.Ct. 2441, 57 L.Ed.2d 337 (1978) ("Not without reason has Congress refrained from spelling out either the precise criteria for determining what shall constitute a bounty or grant and what shall not, or the calculations to be followed in determining net amount. As this court said in *Hammond Lead*, [*United States v. Hammond Lead Prods.*, 440 F.2d 1024, 58 C.C.P.A. 129, *cert. denied*, 404 U.S. 1005, 92 S.Ct. 565, 30 L.Ed.2d 558 (1971)]: 'In the assessment of a countervailing duty, the determination that a bounty or grant is paid necessarily involves judgments in the political, legislative, or policy spheres,' 440 F.2d at 1030, 58 C.C.P.A. at 137, to which the court might well have added the eminently important economic sphere. Our nation's relationships in the world family are particularly sensitive to the assessment of the additional duties known as 'countervailing' duties. Such assessment is not just a means of protecting our producers, as Congress has recognized in refusing to require proof of injury before making such assessment; it is also one of the chips in a game played by governments on a world stage.").

*Arjay*, 8 Fed. Cir (T) at 18–20, 891 F.2d at 896–898.

tion"[88] that the procedures and hearing be fair, see *Norwegian Nitrogen Prods. Co. v. United States*, 288 U.S. 294, 321, 53 S.Ct. 350, 360, 77 L.Ed. 796 (1933), and not a "hollow formality."[89] Prejudgment of an antidumping investigation, wherein the decisionmaker has a closed mind at initiation, would undermine the statutory procedures that Congress has prescribed. Recognition of a statutorily based prejudgment claim is therefore appropriate.[90]

■ By its nature, however, the claim is limited, and the burden for establishing it is heavy. Principles applicable to constitutionally based bias claims are equally applicable to the statutory claim. To begin, administrative decisionmakers enjoy a presumption of honesty and integrity which must be overcome. *Withrow v. Larkin*, 421 U.S. 35, 47, 95 S.Ct. 1456, 1464, 43 L.Ed.2d 712 (1975) ("The contention that the combination of investigative and adjudicative functions necessarily creates an unconstitutional risk of bias in administrative adjudication ... must overcome a presumption of honesty and integrity in those serving as adjudicators; ...."). In evaluating NEC's claim for prejudgment, "the Court starts with the assumption that the decisionmaker, the Assistant Secretary for Import Administration, is a person of honesty and integrity—basically, that he or she does not prejudge investigations." *NEC Corp. v. United States*, Court No. 96–10–02360, at 8 (Mem. Op. and Order on Pl.'s Mot. for Prelim. Inj., Mar. 21, 1997).

■ A public position on a policy issue is not disqualifying; nor is prior knowledge of adjudicative facts. See *Hortonville Joint School Dist. No. 1 v. Hortonville Education Assn.*, 426 U.S. 482, 493, 96 S.Ct. 2308, 2314, 49 L.Ed.2d 1 (1976) ("Mere familiarity with the facts of a case gained by an agency in the performance of its statutory role does not, however, disqualify a decisionmaker.... Nor is a decisionmaker disqualified simply because he has taken a position, even in public, on a policy issue related to the dispute, in the absence of a showing that he is not 'capable of judging a particular controversy fairly on the basis of its own circum-

**88.** *Norwegian Nitrogen Prods. Co. v. United States*, 288 U.S. 294, 321, 53 S.Ct. 350, 360, 77 L.Ed. 796 (1933).

**89.** *Association of National Advertisers, Inc. v. FTC*, 627 F.2d 1151, 1187 (D.C.Cir.1979)(MacKinnon, J., dissenting).

**90.** The Court's recognition of a statutorily based prejudgment claim seeking disqualification of a decisionmaker in an antidumping investigation does not extend to recognition of NEC's general claim of "institutional bias" seeking disqualification of the entire Commerce Department based on an alleged bias in favor of a domestic manufacturer. Recognition of an institutional bias claim is appropriate when structural infirmities within a decisionmaking body render it biased as a matter of law. See, e.g., *Gibson v. Berryhill*, 411 U.S. 564, 578–79, 93 S.Ct. 1689, 1697–98, 36 L.Ed.2d 488 (1973) (finding that members of the Georgia Board of Optometry who stood to gain from reduced competition resulting from license revocations could not in fairness adjudicate those revocations). Where no comparable structural bias (e.g., "potential conflict of interest or a pecuniary stake in the outcome of the litigation," *Brooks v. New Hampshire Supreme Court*, 80 F.3d 633, 640 (1st Cir.1996) (citations omitted)) exists, "an entire group of adjudicators cannot be disqualified wholesale solely on the bases of an alleged institutional bias in favor of a rule or policy promulgated by that group." *Id.* (citing *Doolin Security Savs. Bank v. FDIC*, 53 F.3d

1395, 1407 (4th Cir.1995) and *Hammond v. Baldwin*, 866 F.2d 172, 177 (6th Cir.1989)).

The *Doolin* court observed, "Presumably all agencies inherently have some level of 'institutional bias,' but such an interest does not render all agencies incapable of adjudicating disputes within their own proceedings given the strong public interest in effective, efficient, and expert decisionmaking in the administrative setting." *Doolin*, 53 F.3d at 1407. That observation is applicable to Commerce's administration of the antidumping laws. A general allegation of bias in favor of a domestic manufacturer could probably be made in all dumping investigations; this is simply a consequence of enforcing laws intended to remedy the injury caused by less than fair value imports. The fact that domestic manufacturers stand to benefit from the imposition of antidumping duty orders does not render Commerce incapable of conducting investigations.

There is no structural bias operating in Commerce's administration of the dumping laws that implicates an institutional bias claim, least of all here. Commerce's decision to alert another federal agency of a potentially unfair practice under the antidumping laws is a lawful action, see *infra* n. 97, that will not support a claim of institutional bias even if characterized as manifesting a bias in favor of a domestic manufacturer. Here, fairness in the administrative proceeding is safeguarded adequately by recognition of the prejudgment claim.

stances.'")(quoting *United States v. Morgan,* 313 U.S. 409, 421, 61 S.Ct. 999, 1004, 85 L.Ed. 1429 (1941)) (citations omitted).

■ A general claim of agency viewpoint or policy bias is not actionable. *See, e.g., FTC v. Cinderella Career & Finishing Schools, Inc.,* 404 F.2d 1308, 1315 (D.C.Cir. 1968) (*Cinderella I*), (refusing to enjoin Federal Trade Commission from conducting hearing on plaintiff's alleged unfair trade practices notwithstanding the Commission's pre-hearing issuance of a press release stating the Commission had found "reason to believe" that the law had been violated). *See also Withrow,* 421 U.S. at 58, 95 S.Ct. at 1470 ("The initial charge or determination of probable cause and the ultimate adjudication have different bases and purposes. The fact that the same agency makes them in tandem and that they relate to the same issues does not result in a procedural due process violation."). Thus, the Assistant Secretary's preliminary opinion on whether imports are being dumped cannot alone support disquali-

fication. The antidumping statute contemplates that a decisionmaker will make up his or her mind over the course of the administrative process, starting from a viewpoint at the initiation of the investigation, "there may be dumping," and leading to a conclusion upon issuance of the final determination, "there is dumping," or "there is no dumping." *NEC Corp. v. United States,* 958 F.Supp. 624, 629 (CIT 1997).

■ As noted above, the Assistant Secretary for Import Administration is the decisionmaker for antidumping investigations. *See supra* p. 319. The Assistant Secretary, of course, cannot make every decision in every case.[91] The sheer volume of data, the technical nature of the issues in complex cases, and the large number of proceedings (investigations and reviews) require the Assistant Secretary to rely heavily upon the recommendations and assistance of the investigation team and other import administration[92] and Commerce Department staff.[93]

---

**91.** *See* Esserman Dep., Hr'g Exs. And Docs., Vol. 4, Tab 70 at 185.

**92.** The Director for Policy and Analysis within the Office of the Assistant Secretary is the principal advisor to the Assistant Secretary on administrative and management policy for Import Administration. Department of Commerce Organization and Function Order 41–1 at § 2.03. This responsibility includes addressing disputed issues of methodology. In addition, the Director oversees the day-to-day operations of the Office of Accounting, the Office of Policy, and the Central Records Unit. *Id.* The Director of Policy and Analysis reports directly to the Assistant Secretary for Import Administration. UF ¶ 63, Pretrial Order at 23.

The Office of Accounting provides accounting/financial policy guidance in the administration of the Antidumping and Countervailing Duty laws, provides accounting and financial support for cost-accounting issues related to the cost of production and constructed value analyses, and also provides expert advice and position papers to the office of the Assistant Secretary. Department of Commerce Organization and Function Order 41–1 § at 2.03b. In this capacity, the Director of the Office of Accounting and his staff address accounting and methodological issues that can significantly impact the outcome of an antidumping case. UF ¶ 65, Pretrial Order at 24.

The Office of Policy serves as the principal staff in the formulation and implementation of policies governing the Department's administration of the Antidumping and Countervailing Duty stat-

utes. Department of Commerce Organization and Function Order 41–1 at § 2.03a. In consultation with the Office of the Chief Counsel for Import Administration, the Office of Policy is responsible to ensure that the AD law is administered consistent with Congressional intent and is responsible to ensure the uniform application of statutory and regulatory provisions of the AD/CVD laws and regulations. *Id.* In this capacity, the Director of the Office of Policy and his staff address interpretations of the AD statute and regulations. UF ¶ 64, Pretrial Order at 23–24.

The Office of the Chief Counsel for Import Administration is charged with providing legal services to the Import Administration. In this capacity, the Chief Counsel for Import Administration and his staff address interpretations of the AD laws and regulations and renders advice on various legal decisions that may have a significant impact on the outcome of an antidumping case. Moreover, the Chief Counsel for Import Administration reports directly to the General Counsel. Department of Commerce Organization Order 10–06 at § 2.02. Within the Office of the Chief Counsel for Import Administration, there is at least one attorney and a supervising attorney assigned to each antidumping proceeding conducted by Import Administration. UF ¶ 67, Pretrial Order at 25.

**93.** For example, the General Counsel "is the chief law officer of the Department, and legal advisor to the Secretary, the Under Secretaries, the Assistant Secretaries, and other officers of the Department, including operating heads."

Despite their influence in antidumping investigations, the independently formed opinions of Import Administration staff are not relevant to the prejudgment cause of action recognized here. Import Administration staff must communicate their recommendations to their superiors as part of their official duties; these recommendations are not final, however important they may be, and cannot lead to a showing that the mind of the Assistant Secretary for Import Administration, the decisionmaker in antidumping investigations, is closed. *See NEC Corp. v. United States,* 958 F.Supp. 624, 635–36 (CIT 1997) (citing *Corning Savings & Loan Assn. v. Federal Home Loan Bank Bd.,* 571 F.Supp. 396, 404 (E.D.Ark.1983), *aff'd,* 736 F.2d 479 (8th Cir. 1984)).[94] For similar reasons the opinions of officials from other agencies are also not relevant to NEC's prejudgment claim. *Id.* at 635.

Antidumping proceedings are not adjudicatory[95] but investigatory, *see* H.R.Rep. No. 96–317, at 77 (1979); S.Rep. No. 96–249, at 100 (1979), *reprinted in* 1979 U.S.C.C.A.N.

381, 486. *See also Budd Co. v. United States* 1 CIT 67, 72, 507 F.Supp. 997, 1001 (1980) ("Congress has recognized that the administrative proceedings under Title VII of the Tariff Act of 1930 are investigatory, not adjudicatory."), with statutorily prescribed procedures: a final determination in which the Department must articulate and substantiate its decisionmaking, *see* 19 U.S.C. § 1677f(i)(3)(A) (1994); an opportunity to submit factual information and legal argument, *see* 19 U.S.C. § 1677m(d)(e) (1994); 19 C.F.R. §§ 353.31(a)(2), 353.38(c)(2) (1996); an opportunity to argue important issues at a hearing, *see* 19 U.S.C. § 1677c (1994); 19 C.F.R. § 353.38(b) (1996); and an opportunity for judicial review of the final determination to insure Commerce's decision is supported by substantial evidence and in accordance with law. *See* 28 U.S.C. § 1581(c); 19 U.S.C. § 1516a(a)(2)(B)(i), 1516a(b)(1)(B)(i).

While these procedures must not be rendered nugatory by prejudgment, at the same time, any claim of prejudgment must be cir-

Department of Commerce Organization Order 10–6 at § 3.01. The functions of the Office of General Counsel for the Department of Commerce include "the preparation or review of pleadings, briefs, memoranda, and other legal documents necessary in proceedings involving the Department, or requested by any other Government agency for use in proceedings." Department of Commerce Organization Order 10–06 at § 4.01c. The General Counsel reports directly to the Secretary of Commerce. *Id.* at § 2.01.

94. The opinions of career staff about an investigation are not relevant for a prejudgment cause of action, and therefore, not discoverable. Nevertheless, outcome directives from the Assistant Secretary for Import Administration to Import Administration staff prior to initiation of an investigation are potentially discoverable, assuming there is an actual risk of prejudgment present. *See, e.g., NEC Corp. v. United States,* 958 F.Supp. 624, 636 (CIT 1997) ("the Court is allowing discovery [of a staff member] solely on the question of directives he has received from superiors with respect to the outcome of the supercomputer investigation.").

95. *See* 19 U.S.C. § 1677c(b) ("The hearing shall not be subject to the provisions of subchapter II of chapter 5 of title 5 [defining administrative procedures], or to section 702 of such title."). The D.C. Circuit requires recusal of a decision-

maker in an adjudicatory administrative proceedings

> where 'a disinterested observer may conclude that [the decisionmaker] has in some measure adjudged the facts as well as the law of a particular case in advance of hearing it.' *Cinderella Career and Finishing Schools, Inc. v. FTC,* 138 U.S.App. D.C. 152, 160, 425 F.2d 583, 591 (1970). In other words, we will set aside a commission member's decision not to recuse himself from his duties only where he has "demonstrably made up [his] mind about important and specific factual questions and [is] impervious to contrary evidence."

*Metropolitan Council of NAACP Branches v. FCC,* 310 U.S.App. D.C. 237, 247–48, 46 F.3d 1154, 1164–65 (1995) (quoting *United Steelworkers of America v. Marshall,* 647 F.2d 1189, 1209 (D.C.Cir.1980), *cert. denied,* 453 U.S. 913, 101 S.Ct. 3148, 69 L.Ed.2d 997 (1981)). The constitutionally driven concerns of formal adjudicatory proceedings are not at issue in antidumping cases. *See* discussion *supra* p. 326–27.

The D.C. Circuit has articulated an even higher standard for establishing prejudgment in a rule-making-like proceeding. *See Association of Nat'l Adverts. v. FTC,* 201 U.S.App. D.C. 165, 172–84, 627 F.2d 1151, 1158–70 (1979) ("[A] Commissioner should be disqualified only when there has been a clear and convincing showing that the agency member has an unalterably closed mind on matters critical to the disposition of the proceeding.").

cumscribed to ensure that the administrative process is not disrupted. Thus, the claim recognized by the Court precludes only conduct by the decisionmaker that will render the statutory procedures a hollow formality.

Under this statutory scheme, a plaintiff must demonstrate more than the appearance of prejudgment to disqualify a decisionmaker. A plaintiff must show from the conduct and statements of the decisionmaker [96] that the outcome of the investigation had already been determined and that plaintiff's participation in the administrative process would be futile.

In addition, the presumption of honesty and integrity operating in favor of administrative decisionmakers coupled with the considerable process Congress has codified in the antidumping statute requires clear and convincing proof for the court to conclude that the process has actually been undermined by prejudgment. *See Association of Nat'l Advers. v. FTC,* 201 U.S.App. D.C. 165, 172–84, 627 F.2d 1151, 1158–70 (1979) ("The

'clear and convincing' test is necessary to rebut the presumption of administrative regularity.").

NEC has an added burden in the present case because a new decisionmaker replaced the Assistant Secretary under whose command the predecisional analysis and letter were prepared and disseminated. Furthermore, as noted above, *supra* 319–20, Acting Assistant Secretary Robert LaRussa has had only a cursory involvement with the matters in dispute here. NEC's burden is twofold: first, to demonstrate that Mr. LaRussa's predecessor prejudged the investigation, and second, that by virtue of that prejudgment, Mr. LaRussa's decisional independence is constrained in a way that precludes a fair investigation.

Applying the standard articulated above to the facts of this case, the risk of prejudgment arose from Import Administration's rendering advice to another federal agency prior to initiation of a formal dumping investigation.[97] The advice was first giv-

---

**96.** The focus is on the conduct and statements of the decisionmaker and not his or her mental processes to avoid a potentially unwarranted intrusion into legitimate executive department functioning. *See* cases cited *infra* n. 97.

**97.** NEC challenges Commerce's authority to advise another federal agency about possible dumping, contending that the transmittal of the predecisional memorandum to NSF was *ultra vires*. Commerce does have the authority to undertake a predecisional dumping analysis to decide whether to self-initiate an antidumping investigation. *See* 19 U.S.C. § 1673a(a)(1); *see, e.g., Dynamic Random Access Memory Semiconductors of 256 Kilobits and Above from Japan,* 50 Fed. Reg. 41,450 (Dep't Commerce 1985)(init. antidumping duty invest.); *Certain Softwood Lumber Products from Canada,* 56 Fed.Reg. 56,055 (Dep't Commerce 1991)(self-initiation countervailing duty invest.). Having the responsibility and expertise for administration of the antidumping laws and being the "master" of those laws, *Daewoo Elecs. Co. v. International Union,* 6 F.3d 1511, 1516 (Fed.Cir.1993) (citing *Consumer Prods. Div., SCM Corp. v. Silver Reed Am., Inc.,* 753 F.2d 1033, 1039 (Fed.Cir.1985)), Commerce here had the authority to share its analysis with another federal agency confronted with a dumping issue. NSF has no experience with the antidumping law, but it believed the dumping issue was potentially relevant given that the procurement was governed by standards that discourage "noncompetitive practices." *See supra* at pp. 319, 321; Commerce's transmittal of its analysis

to NSF was consistent with the "general presumption that information obtained by one Federal Government agency is to be freely shared among Federal Government agencies." *Inter–Departmental Disclosure of Information Submitted Under The Shipping Act of 1984* 9 Op. OLC 48, 53 (Feb. 8, 1985).

NEC further asserts that Commerce's actions were nevertheless *ultra vires* on the ground that when the Predecisional Memorandum was prepared Commerce's real motivation was not to analyze self-initiation but to prevent the UCAR procurement of NEC supercomputers. Hence, NEC seeks to litigate, as a factual matter, Commerce's motivation for the preparation of the Joffe letter and the Predecisional Memorandum. The Court ruled at the pretrial conference that it would not decide this issue. To inquire into the motivation of an otherwise lawful activity and probe the mind of government officials would represent an unwarranted intrusion into legitimate executive department functioning. Because the Court concluded that it is lawful for the ITA to prepare a predecisional dumping analysis and share it with another federal agency confronting a dumping issue, inquiry into ITA's motivation would intrude inappropriately into an executive official's decision-making process. *See, e.g.,United States v. Morgan,* 313 U.S. 409, 422, 61 S.Ct. 999, 1004–05, 85 L.Ed. 1429 (1941); *NLRB v. Donnelly Garment Co.,* 330 U.S. 219, 229, 67 S.Ct. 756, 762, 91 L.Ed. 854 (1947)(" 'The devil himself knoweth not the mind of man,' and a modern reviewing court is not

en orally by Ms. Esserman [98] at the May 13th interagency meeting with representatives from NSF, and subsequently reduced to writing at NSF's request with the result being the Joffe letter and the Predecisional Memorandum.

The Predecisional Memorandum and Joffe letter do not in and of themselves establish prejudgment. The letter is not definitive: Commerce *"estimated"* that NEC's bid to supply UCAR was below cost, and that the dumping margin on NEC's UCAR bid "is *likely* to be very high," and that UCAR's acquisition of NEC supercomputers *"could* have a serious adverse impact on the domestic industry's efforts to develop a more advanced version of the supercomputer system to be supplied." [99] *See Cinderella I*, 404 F.2d at 1315 (addressing the issue of whether the FTC's issuance of press releases stating that the Commission had "reason to believe" that the law had been violated constituted prejudgment, the court rejected the contention that issuance of the press releases, in and of themselves, placed Commission members "under a very real pressure to vindicate themselves and justify their charges.").

The Predecisional Memorandum is not definitive either. It was based only on information available to the Department at the time it was prepared.[100] It was not based on NEC's actual sales and cost data that would be used for the preliminary and final determinations, assuming NEC participated in the investigation. With different data from completed questionnaire responses, the results of the actual investigation could be different. *See* Esserman Prelim. Inj. Test., Hr'g Exs. and Docs., Vol. 2, Tab 38 at 2233–236.

The Predecisional Memorandum includes costs for Research and Development ("R & D") in its calculation of estimated dumping margins.[101] NEC argues that this indicates prejudgment of the critical methodological issue in the investigation.[102] The Court does not agree. In the formal investigation, NEC would be free to argue, in its case brief and at a hearing, its position on R & D expenses. *See, e.g., FTC v. Cement Institute*, 333 U.S. 683, 701, 68 S.Ct. 793, 803, 92 L.Ed. 1010 (1948) ("Here, . . ., members of the cement industry were legally authorized participants in the hearings. They produced evidence—volumes of it. They were free to point out to the Commission by testimony, by cross-examination of witnesses, and by arguments, conditions of the trade practices under attack which they thought kept these practices within the range of legally permissible business activities."). The Court cannot conclude that the procedures for argument and submission of factual information on R & D expenses were rendered meaningless by the Predecisional Memorandum. If anything, their meaning was only amplified as NEC became aware of the Department's prelimi-

---

much better equipped to lay bare unexposed mental processes."); *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 420, 91 S.Ct. 814, 825–26, 28 L.Ed.2d 136 (1971); *United States v. Microsoft Corp.*, 56 F.3d 1448, 1459 (D.C.Cir.1995); *Bacon v. Department of Housing and Urban Dev.*, 757 F.2d 265, 269–70 (Fed.Cir. 1985).

The Court stated at the pretrial conference that "[t]he outstanding factual question to be resolved is whether the dissemination of the predecisional analysis and accompanying explanations about its contents compromise the Department's ability to conduct the pending antidumping investigation . . . . the Court recognizes that advice had been rendered and, subsequently, the UCAR procurement was put on hold . . . the Court must determine whether the advice and the manner in which it was given would render a decisionmaker reluctant or unable to reach a result contrary to the initial advice. Thus, while [the Court] will not allow inquiry into the decisionmaker's motivations or thought process, [the Court] will allow

inquiry into the practical consequences of the predecisional advice on the ultimate determination." Tr. Pre–Trial Conf. at 5–6, April 7, 1997, Ct. Doc. # 155.

**98.** Although no longer the Assistant Secretary for Import Administration at the time of the meeting, Ms. Esserman remained the Department's principal spokesperson on the UCAR issue.

**99.** Hr'g Exs. and Docs., Vol. 1, Tab 14.

**100.** The information used included U.S. Government information estimating NEC's costs, the Thorndyke Study, and information from NEC financial statements. UF ¶ 26, Pretrial Order at 14.

**101.** *see* Hr'g Exs. And Docs., Vol. 1, Tab 15 at 2.

**102.** *See* Pls.' Post–Trial Memo. at 64–66, Ct. Doc. # 187.

nary thinking on a key methodological question.

The allegation in NEC's complaint that presented an actionable claim necessitating trial was contained in paragraph. 24, which stated, "Commerce representatives repeatedly stated [at interagency meetings] that the NEC supercomputers were being offered to UCAR at less than fair value." [103] Through the course of the litigation, it became apparent to the Court that the critical event in NEC's prejudgment claim was the May 13th meeting when Commerce discussed its preliminary analysis of NEC's bid with representatives from NSF, and at which the alleged statements from paragraph 24 of the Complaint would have been made. It is to the substance of the May 13th meeting that the Court now turns.

During the May 13th meeting Ms. Esserman explained the structure and operation of the antidumping statute and presented the Department's preliminary analysis of NEC's UCAR bid. [104]

Mr. McPhee, the Director of Commerce's Office of Computers and Business Equipment within the Office of Trade Development, [105] had prepared proposed "Talking Points" for the May 13th interagency meeting. [106] Mr. McPhee's draft "Talking Points" contained the following "Summary of Antidumping Findings: Based on a comparison of NEC's bid price to its estimated cost of production ... we find that dumping is occurring at significant levels, ranging from approximately 100–300 percent." [107] Mr. McPhee's source for the percentage estimates was the Department's predecisional analysis. [108]

Ms. Esserman reviewed Mr. McPhee's "Talking Points," concluded that they were inappropriate, [109] and did not use them for her presentation at the May 13th meeting, [110] although they were in her possession. [111] At the meeting, Ms. Esserman indicated that based on the preliminary analysis the NEC bid could result in substantial dumping margins, ranging from 100–300%. [112]

In response to questions from NSF about the likely outcome of the administrative proceedings, Ms. Esserman indicated that a dumping finding and an injury determination by the ITC could be made and successfully upheld. [113]

This statement can be interpreted two ways. NEC posits that it demonstrates prejudgment of the antidumping investigation. Alternatively, it can be read as a prediction of a possible outcome. The wisdom of making such a statement can certainly be questioned, especially if issued by a superior in the presence of persons who would staff a future investigation. The risk is that the statement becomes a self-fulfilling prophecy. In this instance, however, the evidence does not support such a conclusion. The state-

103. Compl. ¶ 24, Ct. Doc. # 2.

104. Esserman Prelim. Inj. Test., Hr'g Exs. and Docs., Vol. 2, Tab 38 at 152–53, 225–228; Tr. Eleanor Lewis Trial Test. at 117–20, Ct. Doc. # 177; Tr. Powell Trial Test. at 168, 188–192, Ct. Doc. # 177; Powell Dep., Hr'g Exs. and Docs., Vol. 4, Tab 72 at 10.

105. The Office of Trade Development is separate and distinct from the office of Import Administration although both offices are within the International Trade Administration. *See* U.S. Department of Commerce Organizational Chart, Hr'g Exs. and Docs., Vol. 1, Tab Z.

106. McPhee Prelim. Inj. Test., Hr'g Exs. and Docs., Vol. 2, Tab 38 at 79; Esserman Prelim. Inj. Test., Hr'g Exs. and Docs., Vol. 2, Tab 38 at 39.

107. Pls.' Exs. 2 & 9, Hr'g Exs. and Docs., Vol. 1, Tabs 2 & 9.

108. McPhee Prelim. Inj. Test., Hr'g Exs. and Docs., Vol. 2, Tab 38 at 80–1.

109. Esserman Prelim. Inj. Test., Hr'g Exs. and Docs., Vol. 2, Tab 38 at 42–49.

110. *Id.;* McPhee Prelim. Inj. Test., Hr'g Exs. and Docs., Vol. 2, Tab 38 at 79. *See also* Tr. Eleanor Lewis Trial Test. at 120–122, Ct. Doc. # 177.

111. *See* Tr. Taverman Trial Test. at 288, Ct. Doc. # 178.

112. Tr. Rudolph Trial Test. at 375; 440–42; 444–45, Ct. Doc. # 179.

113. *Id.* at 375, 444–5; see also Mr. Rudolph's contemporaneous notes of the meeting and those of Mr. Correll, who was also in attendance, Pls.' Exs. 30 & 31, Hr'g Exs. and Docs., Vol. 1, Tabs 30 & 31.

ment was preliminary and advisory. Mr. Rudolph, NSF's general counsel who attended the May 13th meeting, testified that Ms. Esserman qualified her belief in the dumping finding as "based on the preliminary analysis as understood to date."[114] Ms. Esserman's statement also was made with sensitivity to the existing data and to the forthcoming administrative process which could alter the result. Ms. Esserman testified at the preliminary injunction hearing that the procedure of an antidumping investigation, and its ultimate conclusion in a final determination, would be based on an entirely different data base that would include the foreign producer's actual data.[115] She also testified at length about the transparent procedures required in the administrative process which could alter the result.[116]

Weighing all the evidence, the Court finds that Ms. Esserman was providing advice in the nature of a forecast rather than prejudging the outcome of the investigation. Consequently, the Court cannot conclude that Ms. Esserman's statement so constrained Mr. LaRussa as to lead to a pre-determined result.

## CONCLUSION

For the foregoing reasons, plaintiffs' application for a permanent injunction is denied. Judgment will be entered accordingly.

## *JUDGMENT*

This case having been duly submitted for decision, after trial and upon due deliberation, the Court having rendered a decision herein; now, in conformity with said decision,

IT IS HEREBY ORDERED, ADJUDGED AND DECREED plaintiffs' application for a permanent injunction is denied, and final judgment is entered for defendant.

---

**114.** Tr. Rudolph Trial Test. at 444–45, Ct. Doc. # 179.

**115.** Esserman Prelim. Inj. Test., Hr'g Exs. and Docs., Vol. 2, Tab 38 at 235–237.

